MESCH, CLARK & ROTHSCHILD, P.C.
259 North Meyer Avenue
Tucson, Arizona 85701
Phone: (520) 624-8886
Fax: (520) 798-1037
Email: lrothschild@mcrazlaw.com
    sgan@mcrazlaw.com
    fpetersen@mcrazlaw.com
By:   Lowell E. Rothschild, # 635
     Scott H. Gan, #6568
     Frederick J. Petersen, #19944
     21217-2/tld

Attorneys for Debtor

UNITED STATES BANKRUPTCY COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>CONQUEST SANTA FE, L.L.C.,<br><br>Debtor. | Chapter 11 Proceeding<br><br>No. 4:12-bk-24937-EWH |

# DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT

# TABLE OF CONTENTS

I.        BACKGROUND ........................................................................ 5

II.     INCIDENTS WHICH LED TO THE FILING OF CHAPTER 11 ......................... 10

III.   ASSET DESCRIPTION AND INDEBTEDNESS ................................................. 10

IV.   EVENTS SINCE THE FILING OF CHAPTER 11 ................................................ 11

V.    PRESENT CONDITION AND ANTICIPATED FUTURE OF THE DEBTORS . 12

VI.   EXISTENCE/NON-EXISTENCE OF AVOIDABLE TRANSFERS ................... 12

VII.  SUMMARY OF THE PLAN OF REORGANIZATION ....................................... 12

VIII. CLASSIFICATION OF CLAIMS AND INTERESTS ......................................... 13

        Class 1 – Administrative Claims ................................................ 13

        Class 2 – LPP Mortgage ............................................................ 14

        Class 3 – Santa Fe County Treasurer—Personal Property Taxes. ................. 15

        Class 4 – Santa Fe County Treasurer—Real Property Taxes. ........................ 16

        Class 5 – Priority Tax Claims. .................................................... 16

        Class 6 – General Unsecured Creditors. ....................................... 17

        Class 7 – Equity Interests. ......................................................... 17

IX.   MEANS FOR FUNDING THE PLAN ............................................................... 17

X.    TAX CONSEQUENCES ................................................................................... 18

XI.   LIQUIDATION ANALYSIS .............................................................................. 19

XII.  RISK ANALYSIS .............................................................................................. 20

XIII. CONFIRMATION IN SPITE OF REJECTION OF PLAN ................................. 20

XIV. REJECTION/ASSUMPTION OF LEASES AND EXECUTORY CONTRACTS 21

XV.  EFFECT OF CONFIRMATION ........................................................................ 21

XVI. REVESTING ..................................................................................................... 22

XVII. RETENTION OF JURISDICTION ................................................................... 22

XVIII. MODIFICATION OF PLAN ........................................................................... 23

XIX. RECOMMENDATION ...................................................................................... 24

INTRODUCTION AND REPRESENTATIONS

**Introduction**

Conquest Santa Fe, LLC ("Conquest" or the "Debtor") has proposed a First Amended Chapter 11 Plan (the "Plan"). The Debtor believes this First Amended Disclosure Statement contains information that is material, important, and necessary for creditors to arrive at an informed decision in exercising their right to vote for acceptance of the Plan. This Disclosure Statement is being disseminated in conjunction with the Plan proposed by the Debtor.

The United States Bankruptcy Court for the District of Arizona ("the Court") has set a hearing on confirmation of the Plan in the U.S. Bankruptcy Court, 38 N. Scott Ave., Courtroom #446, Tucson, Arizona. The time and date of the hearing is set forth in the Order which accompanies this Disclosure Statement. Creditors may vote on the Plan by filling out and mailing the accompanying ballot in accordance with the procedure provided on the ballot and the Order Approving Disclosure Statement and Fixing Time for Filing Acceptance or Rejection of Plan, Combined with Notice Thereof, so that it is received at least five (5) business days prior to the date of the hearing. As a creditor, your vote is important. For a class of creditors' claims to accept the Plan, acceptances must be filed by at least 2/3 in amount, and more than ½ in number of the allowed claims of each class that actually vote on the Plan. A failure to vote on the Plan does not constitute either an acceptance or rejection of the Plan.

**Ballot Procedures**

Creditors will receive an electronic or paper copy of this Disclosure Statement, the Plan of Reorganization, an Order setting the hearing on confirmation of the Plan, and a Ballot. The Debtor reserves the right to designate the correct Class, if any creditor submits a Ballot that fails to either identify a Class number or votes a Ballot in an incorrect Class. The Debtor also reserves the right to designate the treatment options

afforded any creditor who submits a Ballot and fails to designate any treatment option afforded that Class, but only if reasonable attempts to contact the creditor to discern its intent have failed.

**Representations**

NO REPRESENTATIONS CONCERNING THE DEBTOR OR THE PLAN ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS TO OBTAIN YOUR ACCEPTANCE OF THE PLAN OTHER THAN AS CONTAINED HEREIN SHOULD NOT BE RELIED UPON. THE INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED. THE DEBTOR IS UNABLE TO REPRESENT THAT THE INFORMATION HEREIN IS WITHOUT ANY INACCURACY, ALTHOUGH THE INFORMATION DISCLOSED IS ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF.

THE COURT HAS NOT VERIFIED THE ACCURACY OF THE INFORMATION CONTAINED HEREIN, AND THE COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THE COURT ENDORSES OR APPROVES THE PLAN, BUT ONLY THAT IF THE INFORMATION IS ACCURATE, IT IS SUFFICIENT TO PROVIDE AN ADEQUATE BASIS FOR CREDITORS TO MAKE AN INFORMED DECISION WHETHER TO ACCEPT OR REJECT THE PLAN.

**Defined Terms**

Most words or phrases in this Disclosure Statement have their usual and customary meanings. Certain capitalized terms have the same meaning as defined in Exhibit A to the Plan, or as defined in this Disclosure Statement or the Plan. If not otherwise defined, certain terms in this Disclosure Statement have the meaning provided in the Bankruptcy Code or Bankruptcy Rules.

**Source of Information for the Disclosure Statement**

1     This Disclosure Statement was prepared with information provided by

2   representatives of the Debtor. All accounting information has been provided by The Rim

3   Corporation, the professional management company employed by the Debtor to manage the

4   hotel. RIM uses generally accepted accounting methods in the hotel industry.

5   **I.  BACKGROUND**

6         The Debtor owns and operates the 92-room Hyatt Place Hotel on Cerrillos Road in

7   Santa Fe, New Mexico (the "Hotel"). The Hotel was opened for business on May 25, 2010.

8         The Hotel is professionally managed by RIM Hospitality ("RIM"), headquartered in

9   Newport Beach, California. RIM has been the manager of the hotel since its opening.

10        On or about October 10, 2009, Conquest entered agreed to a loan package with

11  Charter Bank from New Mexico (the "Original Lender"). The Loan Commitment from the

12  Original Lender included a construction loan (to build the Hotel), a letter of credit loan (for

13  development of the Hotel site), and a commitment from Charter Bank for a 20-year mini-

14  perm loan in the amount of $7,630,824.00. The Loan Commitment also included an SBA

15  Authorization for Debenture in the amount of $2 million to be issued by the Enchantment

16  Land Certified Development Company and used to fund a Section 504 loan, related to the

17  Hotel, and to be repaid over 20 years. The SBA Debenture was intended to assist the

18  borrower in purchasing and developing the collateral. It was always intended as part of the

19  loan commitment that the SBA Debenture, along with the mini-perm loan, would provide

20  20-year permanent financing for the Hotel, upon completion of construction.

21        On or about October 10, 2008, Conquest entered into a construction loan with the

22  Original Lender in the principal amount of $9,585,824.00. The construction loan had an

23  original maturity date of October 10, 2009, which was later extended to April 10, 2010. The

24  construction loan had an interest rate equal to prime plus one percent.

25        The construction loan required monthly interest-only payments, with a lump sum

26  payment of all principal and remaining interest due at maturity. The construction loan

authorized the lender to place $480,758.00 of the stated principal amount in an interest reserve.

In connection with the construction loan, the loan package included a letter of credit note in the amount of $712,502.00, to cover various development requirements to the City of Santa Fe. It had an original maturity of January 10, 2011. The line of credit was for site improvements and had a variable rate of interest equal to prime plus one percent.

On November 23, 2009, the borrower and lender entered into a Change in Terms Agreement. The agreement provided that the original promissory note, with a then current principal balance of $2,683,998.70 would have a reduced credit limit of $9.35 million. In addition, the letter of credit note in the original amount of $712,502.00 was cancelled.

In January of 2010, the Original Lender was closed by the Office of Thrift Supervision, and the Federal Deposit Insurance Corporation ("FDIC") was named Receiver. The FDIC, as Receiver for the Original Lender promptly assigned all of the FDIC's right, title and interest in and to the loan (the "Loan") and the associated loan documents ("Loan Documents") to Charter Bank of Albuquerque, NM ("New Charter" which includes all of New Charter's successors and assigns) a subsidiary of Beal Financial Corp., effective January 22, 2010, pursuant to that certain "Purchase and Assumption Agreement Whole Bank All Deposits Among Federal Deposit Insurance Corporation, Receiver of Charter Bank, Santa Fe, New Mexico Federal Deposit Insurance Corporation and Charter Bank" (the "Charter Purchase Agreement").

The FDIC informed loan customers of the Original Lender that the terms of loans assigned to New Charter would "not change, because they are contractually agreed to." In addition, pursuant to the Charter Purchase Agreement, New Charter and its successors and assigns assumed liabilities for "Commitments," which were defined as the unfunded portion of a line of credit or other commitment reflected in the books and records of the Original Lender to make an extension of credit (or additional advances with respect to a loan) that

was legally binding on the Original Lender as of the Original Lender's closing. Problematically, New Charter was not an authorized SBA lender, so could not honor the loan commitment given for the Hotel.

Despite being at a critical point in the construction process, funding on the construction loan, and other expenditures related to completing construction and furnishing the hotel ceased with the closing of the Original Lender. The eventual result was that Brand and Morris Eigen, and the Debtor, were forced to expend more than $3 million of liquid funds, plus unpaid work by American Construction Corp. in the amount of approximately $2.7 million to complete construction of the Hotel. Despite the interruptions and delays caused by the bank's closing, and New Charter's silence with regard to funding, the Hotel opened just over 40 days behind schedule, on May 25, 2010.

On May 12, 2010, New Charter sent some of its first correspondence since acquiring the Original Lender—a letter to Conquest Santa Fe indicating the Original Lender had assigned and transferred all rights to New Charter. In the letter, New Charter agreed to advance proceeds for loan draw request no. 13 in the amount of $197,950.00, and FF&E draw request no. 3 in the amount of $316,885.00, "while it reviewed borrower's request that the loan be renewed and extended." The failure by New Charter to fund for a significant period of time placed the Debtor in a state of duress during the final effort to complete construction. Conquest accepted the terms of the letter under duress, in order to get critical funding.

Despite a technical maturity in April 2010, there were numerous issues to be sorted out between the borrower and the lender, surrounding primarily the failure of New Charter to fund, and the associated delays it caused to the Hotel project. In connection with those processes, New Charter represented to Conquest that it would eventually meet all obligations in the loan commitment package, and fund as required under the construction loan. To facilitate New Charter's consideration, Conquest went to great lengths to provide

documents (in some cases numerous times), and even prepared and submitted a "Change Order" for furnishing the Hotel, even though the funding was always contemplated and included in the original construction loan budget.

On September 7, 2010, after significant efforts to obtain construction funding and permanent funding under the loan package, New Charter sent a letter indicating that a consultant had reviewed a series of pay requests totaling $2,265,050.00, and determined that approximately $900,000.00 of such amount would not be funded. The letter stated that New Charter was willing to advance obligated funds under the construction loan in the amount of $1,364,655.41, upon receipt of final documentation.

Conquest provided the final information requested for this construction loan payment, but the additional amount was never funded by New Charter. Instead, on or about October 18, 2010, a demand letter was sent to Conquest indicating that the loan was in default and had an outstanding principal amount due and owing of $6,864,487.33, the total funded, plus the interest taken by Charter Bank, on the over $9.35 million construction loan. The letter incorrectly asserted that interest was accruing at the rate of 18 percent (the default rate), dating back to March 2010. Ironically, in March 2010, New Charter was non-communicative, and failing to fund as required under the construction loan documents. Also surprising to Conquest was that New Charter funded two draws following the claimed default, and made a commitment, approximately a month before the default letter, indicating that it was ready to fund an additional $1.3 million.

By the time it became apparent that New Charter would not honor its funding commitments under the construction loan and the loan commitment package, the credit markets had significantly changed, and Conquest was unable to locate alternate financing.

Effective October 14, 2011, New Charter was merged with and into Beal Bank, SSB ("Beal Bank"), with Beal Bank as the surviving entity. Beal Bank, as successor-by-merger to New Charter, then assigned all of its right, title, and interest in and to the Loan and the

Loan Documents, to Beal Nevada Corp. Beal Nevada Corp. then assigned all of its right, title, and interest in and to the Loan, the Deed of Trust, and the other Loan Documents to LPP Mortgage, Ltd. ("LLP") Pursuant to the Charter Purchase Agreement, New Charter and its successors and assigns, assumed the role of the Original Lender with respect to the Loan.

LPP now claims it is owed in excess of $10.2 million, based on an assertion that default interest has continued to accrue at the rate of 10% per annum since March 2010. The Debtor categorically disputes this claim.

The Debtor is currently in litigation before the Bankruptcy Court with LPP regarding the allowance of its claim, and regarding damages caused the Debtor by LPP (or its predecessors) actions. The Debtor asserts the accrual of interest and default interest is inappropriate based on the breach of contract and breach of duty of good faith and fair dealing by LPP. As a result, the Debtor believes the claim is properly allowed in the principal amount of the debt, $6,864,487.33, and reduced by the amount of damages caused by LPP's breach of contract and breach of its duty of good faith and fair dealing. Based on its claims, the Debtor believes the Hotel is worth more than the debt, and can repay the allowed claim in full, according to the contractually negotiated terms.

LPP disputes the claims of the Debtor, and asserts the amount of its claim exceeds $10.2 million. LPP further asserts that its claim is accruing interest, going forward, at a rate of 18% per annum. LPP has denied that it breached any contractual obligation, or that it violated any duty to act in good faith.

The outcome of the Litigation will significantly impact the ability of the Debtor to reorganize its affairs and repay other creditors as proposed in this Plan. Depending on the allowed amount of LPP's claim, the Debtor will ask the Court to conduct a valuation of LPP's collateral, and bifurcate the claim into a secured and unsecured portion. The secured claim will be paid according to the treatment set forth below, and the unsecured claim paid pro rata, with other unsecured creditors.

## II. INCIDENTS WHICH LED TO THE FILING OF CHAPTER 11

When a default notice was sent by New Charter, settlement efforts immediately began to attempt to find an acceptable resolution for all parties, with New Charter and then LPP. Unfortunately, settlement efforts broke down and LPP filed a lawsuit in New Mexico Federal District Court, asserting claims against the Debtor and its principals, and seeking appointment of a receiver to take control of the Hotel.

## III.     ASSET DESCRIPTION AND INDEBTEDNESS

The 92-room Hotel has a built area totaling of 58,541 square feet. Amenities include 1260 square feet of meeting space, a business center, a breakfast area, a fitness center, and an indoor swimming pool.  The Hotel site is a total of 87,120 square feet (appx. 2 acres).

In addition to the realty associated with the Hotel, the Debtor owns all equipment, fixtures, furnishings, and other appurtenances related to operation of a hotel.  A detailed listing of the Debtor's assets, including real and personal property, is included in the Debtor's Schedules, DE # 26.

The Debtor has operated the Hotel, post-petition. Proceeds from rental activities are used to pay operating expenses, fund capital improvements, and any remaining funds are held in operating accounts. Following almost two years of revenues below projections, as a result of the weak economy and travel industry, trends suggest a very strong year for the Hotel's operations. For the first four months of this year, the Hotel has exceeded revenue projections by more than 17% during the historic low season.  The Debtor believes the high season, which is just starting, will continue to demonstrate strong sales and improved performance. Conservatively, without adjusting revenues for May through December based on the trend observed for the first four months of this year, the current Hotel projects EBITDA of $360,479 for the year. (See Attached Exhibit 1) If the revenue trends continue as the Debtor expects, Net Revenue will far exceed this amount.

The Debtor estimates that the value of the hotel at approximately $8.5-9.0 million. In addition, the Debtor's furniture, fixtures and equipment have a value of approximately $1-1.2 million. The Debtor also is currently holding cash of approximately $250,000 in its various accounts. Based on the nature of the Debtor's business, it has very few accounts receivable. All accounts receivable that existed as of the filing have been collected. Accounts receivable are generally in the $15,000-25,000 range, and are collected in the ordinary course of business. The Debtor does not anticipate that any of its accounts are bad debts.

**IV.EVENTS SINCE THE FILING OF CHAPTER 11**

The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on November 16, 2012.

Conquest obtained approval for the employment of Mesch, Clark & Rothschild, P.C. to represent it in this bankruptcy proceeding. Mesch, Clark & Rothschild is also representing the Debtor in the pending litigation by and against LPP.

The Debtor filed a Motion for Use of Cash Collateral, which was eventually stipulated to by LPP. The authorization to use Cash Collateral has since been extended, by stipulation. The Debtor continues to operate under an agreed budget for use of cash collateral. All ongoing operations are funded from the use of LPP's Cash Collateral.

The Debtor hired counsel and filed a motion in the New Mexico Federal District Court, asking that venue of the pending litigation be moved to the Bankruptcy Court. By Stipulation, LPP and the co-defendants each agreed to the Change of Venue. The Debtor has since answered and filed counterclaims against LPP. LPP filed a Motion to Dismiss, which was partially granted by the Court. The Debtor's counterclaims for Breach of Contract and Breach of the Duty of Good Faith and Fair Dealing remain pending against LPP.

### V. PRESENT CONDITION AND ANTICIPATED FUTURE OF THE DEBTORS

Since the bankruptcy filing, the Debtor has continued operations uninterrupted. The franchise agreement with Hyatt required an upgrade to the breakfast area, which was completed for an approximate cost of $21,000. The Hotel continues to be operated, and is experiencing a significant increase in occupancy and thus revenues. The Debtor expects operations during the summer months to be improved compared to last year, and that 2013 performance and profitability will significantly exceed 2012.

### VI. EXISTENCE/NON-EXISTENCE OF AVOIDABLE TRANSFERS

The Debtor does not believe that there are avoidable transfers that could be recovered for the benefit of any of the estate, or for funding under the Plan of Reorganization. The Statement of Financial Affairs for the Debtor indicates that the only payments which exceeded $5,850.00 made in the ninety (90) days prior to the petition date, were payments made in the normal course of business and made as part of a contemporaneous exchange of value.

### VII.     SUMMARY OF THE PLAN OF REORGANIZATION

The goal of this Plan is to continue the operation of the Hotel which will allow the Debtor to repay creditors. The secured debt will be repaid consistent with the original Loan Commitment. The repayment of LPP's loan, according to previously agreed terms, will allow all other creditors to be repaid from future operations.

All claims and interests are placed into classes as set forth below. A claim or interest is placed in a particular class, only to the extent that the claim or interest falls within the description of that class, and is classified in all other classes to the extent that any portion of the claim or interest falls within the description of such other class.

A claim or interest is placed in a particular class for all purposes, including voting on this Plan, confirmation and receiving distributions pursuant to this Plan, only to the extent

that such claim or interest is an Allowed Claim in that class, and such claim has not been paid, released or otherwise settled prior to the Effective Date.

Although the following is not a substitute for a careful reading of the Plan, it is a general discussion of the treatment of allowed claims and interests under the Plan. Through the Plan, the Debtor intends to modify the payment terms of secured and unsecured creditors to allow for substantial payments to all allowed prepetition claims over a period of years.

## VIII.    CLASSIFICATION OF CLAIMS AND INTERESTS

### Class 1 – Administrative Claims

Class 1 is comprised of the holders of administrative expenses. Administrative expenses are those that have been incurred since the initiation of this bankruptcy case on November 16, 2012. The Bankruptcy Code at §507(a)(1) provides that administrative expenses are entitled to a first priority in payment. Administrative expenses are those set forth in §503 of the Bankruptcy Code and are estimated to include the following:

U.S. Trustee Fees (estimated to be zero). *Any amounts owing will be paid on the Effective Date. Debtor shall be responsible for timely payment of fees incurred pursuant to 28 U.S.C. §1930(a)(6). The Debtor shall file with the Court, and serve on the United States Trustee, a quarterly financial report for each quarter (or portion thereof) that the case remains open in a format prescribed by the United States Trustee and provided to the Debtor by the United States Trustee, and shall pay such quarterly fees as due for each quarter post-confirmation that the case remains open.*

Mesch, Clark & Rothschild, P.C. (unpaid attorneys fees). It is estimated that the pre-petition retainer paid to counsel will cover all expenses of the reorganization. Fees incurred to date are less than the retainer amount. This estimate will depend largely, however, on the expense related to the adversary litigation pending before this Court. *Any amounts owing,*

*above and beyond the retainer held by counsel, will be paid on the Effective Date, or as the*
*parties may agree.*

Ordinary Course Operating Expenses. (Estimated to be zero.) Expenses for the Debtor have generally been paid as they are incurred in the ordinary course of business. *To the extent they have not been paid or provided to be paid in the ordinary course of business, they will be paid in the ordinary course of the Debtor's business or on the Effective Date of the Plan.*

**This Class does not vote.**

**Class 2 – LPP Mortgage—Secured Claim**

Class 2 Consists of the Allowed Secured Claim of LPP Mortgage, in an amount to be determined by the Bankruptcy Court in the Adversary Proceeding currently pending before the Court (Adversary No. 4:13-ap-00081-EWH). The Claim asserted by LPP Mortgage is disputed and the Debtor asserts it is entitled to offset any damage claims awarded by the Court against LPP, against the secured claim allowed by the Court for LPP. To the extent the claim allowed by the Bankruptcy Court exceeds $6,864,487.33 (including all interest, fees, costs and other amounts as of the Effective Date), the Debtor will request the Court conduct a valuation of LPP's collateral, to determine the secured and unsecured portion of the Claim, pursuant to 11 U.S.C. §506. The Secured amount of the claim will be treated in this class. Any resulting unsecured claim, will be treated in Class 6, and paid *pro rata* with allowed Class 6 creditors.

*LPP's Allowed Secured Claim will be allowed in the amount determined by the Court, reduced by an offset of any damages awarded the Debtor by the Court, against LPP.*

*Thereafter, LPP's Allowed Secured Claim will be repaid, with interest, according to the same terms and conditions it previously agreed to in the Loan Commitment. The terms*

1   *were offered to the Debtor's by LPP's predecessor, which terms are hereby  assumed and*
2   *accepted by the Debtor.*

3   *Because LPP's Allowed Secured Claim will be repaid according to previously*
4   *agreed loan terms, without modification, LPP's Allowed Secured Claim is not impaired.*

5   *If the Court determines LPP has an unsecured claim, in addition to its secured claim,*
6   *and if LPP elects to have its claim treated as fully secured, pursuant to 11 U.S.C. § 1111(b),*
7   *the Debtor will repay such claim, in full, over a period of time, such that the stream of*
8   *payments equal or exceed the total amount of LPP's claim, and the present value of such*
9   *payments exceeds the value of LPP's collateral as of the Effective Date. In such instance,*
10  *and upon such election, LPP would not be impaired.*

11  **This Class is not impaired and does not vote.**

12  **Class 3 – Santa Fe County Treasurer—Personal Property Taxes.**

13  Class 3 consists of the allowed secured personal property tax claim of the Santa Fe
14  County Treasurer against the Debtor, in the approximate amount of $11,719. This claim is
15  secured by a statutory lien against the personal property located at the Hotel.

16  *On the Effective Date, the Santa Fe County Treasurer's claim will be allowed in the*
17  *principal amount of the tax due, with interest at the statutory rate and without penalties. The*
18  *Allowed Claim will accrue interest post-confirmation at the applicable statutory rate. On*
19  *the Effective Date, Conquest will make a payment equal to 10% of the indebtedness, with*
20  *the remaining balance payable in equal payments of principal and interest. Principal and*
21  *interest payments will be made bi-annually over a period of three years from the Effective*
22  *Date, until paid in full.*

23  **This Class is impaired.**

24

25

26

**Class 4 – Santa Fe County Treasurer—Real Property Taxes.**

Class 4 consists of the allowed secured real property tax claims of the Santa Fe County Treasurer against the Debtor, in the approximate amount of $108,000, which is secured by a statutory lien against the real property which is the Hotel.

*On the Effective Date, the Santa Fe County Treasurer's claim will be allowed in the principal amount of the tax due, with interest at the statutory rate and without penalties. The Allowed Claim will accrue interest post-confirmation at the applicable statutory rate. On the Effective Date, Conquest will make a payment equal to 10% of the indebtedness, with the remaining balance payable in equal payments of principal and interest. Principal and interest payments will be made bi-annually over a period of three years from the Effective Date, until paid in full.*

**This Class is impaired.**

**Class 5 – Priority Tax Claims.**

Class 5 consists of the allowed unsecured priority tax claims held by the City of Santa Fe for lodging occupancy tax and the New Mexico Department of Taxation for State Occupancy Tax.

*Priority Tax Claims will be allowed in the principal amount of the claim plus interest through the Filing Date, at the statutory rate. The allowed claim shall not include any penalties, nor interest between the Filing Date and the Effective Date.*

*On the Effective Date, the holders of priority tax claims will receive a payment equal to 10% of the Allowed Claim. Thereafter, payments of principal, plus interest calculated at the prime rate as established by JPMorgan Chase Bank, or such rate as otherwise set by the Court, will be made in equal monthly installments over a period of three years from the Effective Date.*

**This Class is impaired.**

**Class 6 – General Unsecured Creditors.**

Class 6 consists of the allowed general unsecured claims.

*Conquest's allowed general unsecured creditors will be paid their pro rata share of the initial distribution, in the total amount of $25,000 on the Effective Date. Beginning on the Effective Date, all unpaid amounts of Allowed Unsecured Claims will accrue interest at a rate equal to 2.00% per annum, or such rate as otherwise set by the Court. Beginning on the second anniversary of the Effective Date, and each year thereafter until the Fifth Anniversary of the Effective Date, each claimant will receive an annual distribution, equal to their pro rata share of the greater of $25,000 or 25% of the Net Income of the Hotel, after payment of all other Plan payments. If LPP does not hold a general unsecured claim, it is estimated that all creditors will be repaid within 4 years from the Effective Date. If LPP is awarded a general unsecured claim, creditors will likely not be repaid in full. The amount of repayment will depend on the allowed amount of LPP's claim.* **This Class is impaired.**

**Class 7 – Equity Interests.**

Conquest's prepetition equity holders will continue their ownership of this company post confirmation.

**This Class is impaired**.

**IX. MEANS FOR FUNDING THE PLAN**

The Plan will be funded by future operation of the Debtor's business. During the course of the bankruptcy, there has been a focus on increasing revenues. It is anticipated that growth will be steady for the first year, post Effective Date, then continue for a few years thereafter, until the Hotel reaches a stabilized level. Most important, securing long term financing, according to the terms agreed with LPP will allow the Debtor to operate profitably, sufficient to make substantial and likely full repayment to all creditors over the term of the Plan.

The prior guarantors on the Construction Loan will sign new guarantees for the permanent financing. Additionally, they will contribute additional monies, as and when needed, to support operations and repay creditors.

## X. FUTURE MANAGEMENT OF THE DEBTOR

The current owners of the Debtor will continue to own the equity interests, post-confirmation. They will continue to employ a professional management company, to oversee the day to day operations of the Hotel. The current management Company, The RIM Corporation ("RIM"), will continue to be employed as property manager, post-confirmation. Equity reserves the right to negotiate a new contract with RIM, or hire an alternate property manager, in the business judgment of the owners.

The current equity holders have not ever taken a salary or distribution from the Debtor. They will not take any future distributions, unless and until net revenues are sufficient to make all plan payments, and fund appropriate reserves, in the business discretion of equity. RIM will be paid a management fee that is standard for the industry, according to the terms of their management contract on file at DE #17.

## XI. TAX CONSEQUENCES

The Debtor has not obtained a tax opinion and does not express any opinion as to the tax consequences to the creditors or equity security holders. Interested parties are encouraged to obtain their own professional counsel to determine the tax consequences of the Plan.

BECAUSE THE DEBTOR EXPRESSES NO TAX ADVICE, IN NO EVENT WILL THE DEBTOR OR ITS PROFESSIONAL ADVISORS BE LIABLE FOR ANY TAX CONSEQUENCES OF THE PLAN. CREDITORS MUST LOOK SOLELY TO AND RELY SOLELY UPON THEIR OWN ADVISORS AS TO THE TAX CONSEQUENCES OF THIS PLAN.

## XII.    LIQUIDATION ANALYSIS

Pursuant to 11 U.S.C. §1129(a)(7), the Plan must provide that creditors not accepting the Plan will receive at least as much under the Plan as they would receive in a liquidation of the Debtor under Chapter 7 of the Bankruptcy Code. The Debtor believes that the distributions to creditors under the Plan will exceed the recoveries which creditors would receive in Chapter 7 liquidation of the estates.

A liquidation in a Chapter 7 bankruptcy proceeding will not generate sufficient revenues to pay creditors beyond secured claims. Significant value is in the continued operation of the hotel as a going concern. A Chapter 7 bankruptcy proceeding is a breach of the Hyatt Franchise agreement, which value will be lost if forced into a Chapter 7 liquidation. Personal property assets would likely be liquidated as part of a sale of the Hotel, but if not, for pennies on the dollar. Santa Fe County and LPP are secured creditors against both the real and personal property of the Debtor, and all proceeds will likely to go to secured creditors, with no amounts left to pay other creditors.

The Plan, by comparison, establishes an opportunity to repay all creditors in full, with interest, while maintaining the Debtor's operations as a going concern. The continued operation of the Hotel, and the repayment of the LPP debt according to the contractual terms originally negotiated with the Debtor will return significantly more to creditors than the liquidation alternative.

The Debtor's analysis of the liquidation value of its assets, and a comparison of the treatment of creditors in a hypothetical liquidation, as compared to the proposed Plan is set forth in Exhibit 2.

Accordingly, the "best interests of creditors" test has been satisfied, meaning that creditors receive more if the Debtors reorganize than if assets liquidated.

XIII.    RISK ANALYSIS

The projections are the Debtor's best and most realistic projections of future performance. Based upon these projections, the payments contemplated by the Plan will be made. Inherent in this Chapter 11 Plan are standard business risks. In addition to the risk faced by most businesses, the business conducted by the Debtor is impacted by many other contingencies, including the following factors: the lack of available credit in today's economy both locally and nationally; the rising cost of living; inflation; changes in economic growth; changes to the projected growth in population; and, increased competition from other hotels. Despite these risks, the Debtor's Plan is workable and economically sound. The Plan will pay creditors more than they would receive if the Debtor's Plan were not confirmed, and this bankruptcy estate was liquidated instead.

XIV.    CONFIRMATION IN SPITE OF REJECTION OF PLAN

The Court will be asked to confirm the Plan as to any class of claims or interest that does not accept the Plan. To do so, the Court must find that the Plan is (1) fair and equitable to each class of claims or interests that is impaired and has not accepted the Plan, and that classification of claims is not discriminatory; and (2) that each claim or interest holder receives, under the Plan, property of a value as of the Effective Date, that is not less than what would be received or retained if the property was liquidated under Chapter 7 of the Code.

The second requirement is satisfied as demonstrated by the Liquidation Analysis set forth above. The first requirement is satisfied with respect to any class that might not accept the Plan, because the classification has not been designed in a discriminatory manner.

If a class of secured claims does not accept the Plan, the Code provides that the fair and equitable requirement is satisfied if the class retains its lien and receives deferred cash payments of a present value equal to the value of the claimant's secured interest in the collateral. This requirement may be satisfied as to each class treated as a secured claim,

because the Plan provides for them to receive the value of their interest in their collateral together with an interest at a current rate.

If a class of unsecured claims does not accept the Plan, the fair and equitable rule requires that each claimant be paid the allowed amount of the claim plus interest at a market rate; otherwise, no junior class of creditors can receive or retain any property under the Plan. The Plan proposes full payment to all classes of creditors over time with interest. As a result, the Plan complies with the absolute priority rule and permits current equity to retain its ownership of the Debtor.

## XV.    REJECTION/ASSUMPTION OF LEASES AND EXECUTORY CONTRACTS

Except as specified previously, all contracts which existed on the filing date of the Chapter 11 Petition, between the Debtor and any individual or entity, whether such contracts be written or oral, which have not heretofore been rejected or accepted by the Debtor, will be the subject of future court order as to assumption or rejection as the Debtor retains the right to assume or reject through substantial consummation of the Plan.

With regard to any executory contracts or unexpired lease not addressed, the Court shall retain jurisdiction and the Debtor will retain the ability to assume or reject upon realization of the existence of the contract or lease.

## XVI.             EFFECT OF CONFIRMATION

Except for the continuing liens, claims, rights and interests of the secured creditors against the Debtor, its estate, and the property as described in the Plan and as permitted in the confirmation order, confirmation of a reorganization acts as a discharge, effective on the Effective Date, of any and all debts of the Debtor that arose any time before confirmation, including, but not limited to, all principal and all interest accrued thereon, pursuant to §1141(d)(1) of the Bankruptcy Code. Such a discharge shall be effective as to each claim,

regardless of whether a proof of claim thereof was filed, whether the claim is an allowed claim or whether the holder thereof votes to accept the Plan.

## XVII.   REVESTING

Except as provided for in the Plan or confirmation order, on the Effective Date, the Debtor shall be vested with any remaining property or assets from its estate, free and clear of all claims, liens, charges, and other interests of creditors arising prior to the filing date, except as  provided by this Plan of Reorganization.

## XVIII.   RETENTION OF JURISDICTION

Notwithstanding confirmation or the Effective Date having occurred, the Court shall retain and have full jurisdiction as is allowed under Title 28 of the United States Code, the Bankruptcy Code, or other applicable law to enforce the provisions, purposes, and intent of the Plan, including, without limitation, any proceedings which relate to:

A.      Determination of the allowability, classification, or priority of claims and interests;

B.      Construing, implementing, enforcing, executing, or consummating the Plan, the confirmation order, any other order of the Court, any document attached as an exhibit to the Plan or contemplated by the Plan, or any other matter referred to in the Plan;

C.      Determination of all matters that are pending before the Court in the Chapter 11 Case prior to the Effective Date or that may arise after the Effective Date;

D.      Determination of any and all applications for allowance or requests for payment of administrative claims, including, without limitation, requests for allowance and payment of compensation and expense reimbursement of professional persons;

E.      Determination of motions for the rejection, assumption, or assignment of executory contracts or unexpired leases, and determination of the allowance of any claims resulting from the rejection of executory contracts and unexpired leases.

F.     Determination of all applications, motions, adversary proceedings, contested matters, and any other litigated matters instituted prior to the closing of the Chapter 11 Case;

G.     Modification of the Plan pursuant to §1127 of the Bankruptcy Code, prior to the Effective Date, remedy of any defect or omission in the Plan or confirmation order, reconciliation of any inconsistency within the Plan and the loan documents, so as to carry out the intent and purpose of the loan documents;

H.     Issuance of injunctions or taking such other actions or making such other orders as may be necessary or appropriate to restrain interference with the Debtor by any party with the Plan or its execution or implementation by any person.

I.     Issuance of such orders in aid of consummation of the Plan and the confirmation order, notwithstanding any otherwise applicable non-bankruptcy law, with respect to any person, to the full extent authorized by the Bankruptcy Code;

J.     Ordering the assumption or rejection of executory contracts or leases to which the Debtor is a party, which have not previously been resolved.

K.     Any determination necessary or appropriate under §505 of the Bankruptcy Code or any other determination relating to priority tax claims, taxes, tax refunds, tax attributes, and tax benefits affecting the Debtor, its estates, or the Property through the end of the fiscal year in which the Effective Date occurs;

L.     Entry of a final decree closing the Chapter 11 Case; and

M.     Determination of such other matters, and for such other purposes, as may be provided in the confirmation order.

**XIX.     MODIFICATION OF PLAN**

The Plan may be corrected or modified, prior or subsequent to Confirmation, or prior to consummation, after notice to interested parties and by Court order as provided by law.

1     **XX.      RECOMMENDATION**

2          The Debtor recommends that the Plan be approved as it is in the best interests of the

3 Estate and its creditors.

4         **DATED:** <u>May 20</u>, 2013.

5                           CONQUEST SANTA FE, L.L.C.

6

7

8                   By   <u>s/Brand Eigen</u>
                       Brand Eigen, Manager     366094

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**EXHIBIT 1**

| Budget Item | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Days | 31 | 28 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 | 365 |
| Daily Rooms Available | 92 | 92 | 92 | 92 | 92 | 92 | 92 | 92 | 92 | 92 | 92 | 92 | 92 |
| Rooms Available | 2,852 | 2,576 | 2,852 | 2,760 | 2,852 | 2,760 | 2,852 | 2,852 | 2,760 | 2,852 | 2,760 | 2,852 | 33,580 |
| Rooms Sold | 1,338 | 1,313 | 1,987 | 1,566 | 2,322 | 2,278 | 2,333 | 2,325 | 1,709 | 1,762 | 1,329 | 1,516 | 21,778 |
| Avg. Daily Rate | 78.49 | 76.93 | 84.27 | 82.30 | 85.65 | 103.21 | 107.84 | 110.65 | 96.67 | 100.56 | 85.53 | 86.44 | 93.32 |
| Occ % | 46.91% | 50.97% | 69.67% | 56.74% | 81.42% | 82.54% | 81.80% | 81.52% | 61.92% | 61.78% | 48.15% | 53.16% | 64.85% |
| RevPar | 36.83 | 39.21 | 58.71 | 46.70 | 69.73 | 85.18 | 88.21 | 90.21 | 59.86 | 62.13 | 41.19 | 45.95 | 60.52 |
| **REVENUE** | | | | | | | | | | | | | |
| Rooms | 105,026 | 101,009 | 167,446 | 128,889 | 198,884 | 235,107 | 251,589 | 257,267 | 165,211 | 177,191 | 113,673 | 131,041 | 2,032,330 |
| Food & Beverages | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Parking | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Private Bar & Gift Shop | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Spa | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Operated Departments | 5,268 | 5,031 | 6,026 | 7,713 | 7,969 | 7,821 | 8,006 | 7,979 | 5,905 | 6,084 | 4,625 | 5,255 | 77,684 |
| Transportation (& Cafe) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rentals & Other Income | 550 | 29 | 989 | 903 | 107 | 105 | 107 | 107 | 79 | 81 | 61 | 70 | 3,186 |
| TOTAL REVENUES | 110,843 | 106,068 | 174,461 | 137,504 | 206,960 | 243,033 | 259,703 | 265,353 | 171,194 | 183,356 | 118,359 | 136,366 | 2,113,200 |
| | | | | | | | | | | | | | |
| **DEPARTMENTAL EXPENSES** | | | | | | | | | | | | | |
| Rooms | 61,443 | 59,129 | 64,636 | 75,965 | 77,647 | 77,167 | 79,453 | 79,256 | 62,374 | 64,382 | 51,567 | 56,193 | 809,212 |
| Food & Beverages | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Parking | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Private Bar & Gift Shop | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Spa | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Operated Departments | 9,876 | 8,122 | 7,963 | 9,302 | 13,254 | 13,002 | 13,316 | 13,271 | 9,755 | 10,057 | 7,586 | 8,653 | 124,157 |
| Transportation (& Cafe) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL DEPARTMENTAL EXPENSES | 71,319 | 67,251 | 72,600 | 85,267 | 90,900 | 90,170 | 92,769 | 92,527 | 72,128 | 74,439 | 59,153 | 64,846 | 933,369 |
| | | | | | | | | | | | | | |
| TOTAL DEPARTMENTAL INCOME | 39,524 | 38,818 | 101,861 | 52,237 | 116,060 | 152,863 | 166,934 | 172,826 | 99,066 | 108,916 | 59,206 | 71,520 | 1,179,831 |
| | | | | | | | | | | | | | |
| **UNDISTRIBUTED EXPENSES** | | | | | | | | | | | | | |
| Administrative & General | 19,580 | 16,701 | 23,783 | 23,743 | 18,973 | 20,599 | 20,272 | 20,378 | 17,637 | 17,961 | 16,146 | 16,662 | 232,434 |
| Marketing | 12,024 | 11,923 | 14,529 | 16,314 | 16,395 | 17,745 | 18,368 | 19,364 | 15,084 | 18,687 | 13,117 | 13,773 | 187,323 |
| Franchise Fees | 5,240 | 5,052 | 8,352 | 6,448 | 9,944 | 11,755 | 12,579 | 12,863 | 8,261 | 8,860 | 5,684 | 6,552 | 101,590 |
| Facilities & Maintenance | 6,113 | 7,018 | 6,069 | 11,036 | 8,141 | 7,977 | 8,140 | 8,115 | 7,278 | 7,438 | 6,806 | 7,127 | 91,258 |
| Energy/Utilities | 12,168 | 10,199 | 9,885 | 12,419 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 44,670 |
| TOTAL UNDISTRIBUTED EXPENSES | 55,124 | 50,893 | 62,619 | 69,960 | 53,454 | 58,077 | 59,360 | 60,720 | 48,259 | 52,945 | 41,753 | 44,114 | 657,276 |
| | | | | | | | | | | | | | |
| GROSS OPERATING PROFIT | (15,600) | (12,075) | 39,243 | (17,723) | 62,606 | 94,786 | 107,574 | 112,106 | 50,806 | 55,972 | 17,453 | 27,406 | 522,555 |
| | | | | | | | | | | | | | |
| Management Fees | 3,325 | 3,182 | 5,234 | 4,125 | 6,209 | 7,291 | 7,791 | 7,961 | 5,136 | 5,501 | 3,551 | 4,091 | 63,396 |
| Earthquake Insurance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Property Taxes | 5,799 | 5,799 | 5,799 | 5,799 | 6,588 | 6,588 | 6,588 | 6,588 | 6,588 | 6,588 | 6,588 | 6,588 | 75,897 |
| Insurance | 1,636 | 1,636 | 1,636 | 1,636 | 2,030 | 2,030 | 2,030 | 2,030 | 2,030 | 2,030 | 2,030 | 2,030 | 22,783 |
| EBITDA | (26,360) | (22,692) | 26,574 | (29,283) | 47,779 | 78,878 | 91,165 | 95,527 | 37,053 | 41,853 | 5,285 | 14,698 | 360,479 |
| | | | | | | | | | | | | | |
| Interest Expense-Mortgage | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Interest Expense-Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| NET FROM OPERATION | (26,360) | (22,692) | 26,574 | (29,283) | 47,779 | 78,878 | 91,165 | 95,527 | 37,053 | 41,853 | 5,285 | 14,698 | 360,479 |
| | | | | | | | | | | | | | |
| Extraordinary Items | 395 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 395 |
| Construction & Pre-receiver | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Incentive Pay - Adjusted | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Asset Mgmt Fees & Receiver Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ownership Contract Services | 0 | 325 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 325 |
| Ownership Supplies | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ownership Professional Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ownership Travel & Mtgs | 0 | 0 | 0 | 0 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 320 | 2,560 |
| Net after Ownership Expenses | (26,754) | (23,017) | 26,574 | (29,283) | 47,459 | 78,558 | 90,845 | 95,207 | 36,733 | 41,533 | 4,965 | 14,378 | 357,199 |

**EXHIBIT 2**

| CONQUEST SANTA FE, LLC | | | |
|---|---|---|---|
| Assets | Chapter 7 Liquidation Value | Secured Creditor Amt | Unencumbered Value |
| Hyatt Place Hotel, Santa Fe, NM | $6,120,000 * | $108,000 (Santa Fe County) $6,864,487.33 (LPP) | $0 |
| Cash on Hand after payment of accrued expenses | $250,000 | $6,864,487.33 (LPP) | $0 |
| Equipment, Furniture, Furnishings | $0.00 ** | $11,719 (Santa Fe County) $6,864,487.33 (LPP) | $0 |
| Hyatt Hotels Franchise | $0 | | $0 |

\* Chapter 7 Liquidation Value assumes a 20% impairment to value in a Chapter 7 Liquidation, as compared to value to the Debtor as a going concern. Also, Liquidation expenses are estimated at 10% to include commissions and closing costs. ($8,500,000 * 80% =$6,800,000-10%=$6,120,000)

\*\* In a liquidation, Equipment, Furniture and Furnishings would have no separate value and would be included in the value of the Hotel assets being sold.

| Comparative Treatment of Claims Under Plan | | |
|---|---|---|
| **CONQUEST SANTA FE, LLC** | | |
| Claim | Chapter 7 Distribution | Plan Treatment |
| Class 1 - Administrative Priority Claims | Allowed claims paid in full | Allowed claims paid in full |
| Class 2 - LPP Mortgage | Allowed claim paid remaining proceeds after payment of Secured Tax Claims-- Likely less than full payment | Allowed claims paid in full with interest per Contractual Agreement |
| Class 3 -Personal Property Taxes | Allowed Claims Paid in Full | Allowed Claims paid in full |
| Class 4 - Real Property Taxes | Allowed Claims Paid in Full | Allowed Claims paid in full |
| Class 5 - Priority Tax Claims | Receives Nothing. All proceeds paid to secured creditors. | Allowed Claims paid in full |
| Class 6 - General Unsecured Creditors | Receives Nothing. All proceeds paid to secured creditors. | Allowed Claims paid in full |
| Class 7--Equity | Receives Nothing. | Retains equity after payment in full of all creditors. |